UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

CHRISTOPHER DEVEZIN,

                Plaintiff,

v.

DTE ENERGY COMPANY,

                Defendant.
_____/

Case No. 23-cv-
Hon.

ERIC STEMPIEN (P58703)
STEMPIEN LAW, PLLC
Attorney for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
(734)744-7002
eric@stempien.com
_____/

## **COMPLAINT AND JURY DEMAND**

Plaintiff, Christopher Devezin, by and through his attorneys, Stempien Law, PLLC, hereby complains against Defendant DTE Energy Company, and in support thereof states:

1. Plaintiff Christopher Devezin ("Devezin" or "Plaintiff") is a resident of the City of Westland, Wayne County, Michigan.

2. Defendant DTE Energy Company ("DTE" or "Defendant") is a Michigan corporation with its principal place of business located in the City of Detroit, Wayne County, Michigan.

1

3. Jurisdiction is vested in this Court pursuant to 42 USC §1981 and Title VII of the Civil Rights Act of 1964.

4. Supplemental jurisdiction over Plaintiff's state law claims is proper pursuant to 28 USC §1367.

5. Venue is proper in this Court because the events giving rise to this Complaint occurred in the Eastern District of Michigan.

6. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission, the EEOC issued a Notice of Right to Sue on November 21, 2023 and this Complaint is filed within 90 days of the issuance of the Notice.

## GENERAL ALLEGATIONS

7. Devezin began his employment with DTE on or about May 1998.

8. Devezin was employed by DTE as a journeyman Cable Splicer, and eventually earned the position of Cable Splicer Specialist Leader.

9. Throughout his almost 25-year career with DTE, Devezin was a high performing employee, with an excellent performance history.

10. On or about October 16, 2021, there was a power outage that affected an area located in Livingston County, Michigan.

11. That evening, Cable Splicer Specialist Leader Dan Petrovich ("Petrovich") was sent to the location to determine the source of the outage.

12. Petrovich reported that he had located and isolated the faulted stretch of cable that caused the outage.

13. Petrovich reported to dispatch that he needed an assist, meaning that he needed journeyman level Cable Splicer and a crew of contract laborers to come to the site in order to make the repairs.

14. DTE failed to send a journeyman level Cable Splicer to the site, at which point the job should have been stopped.

15. Despite knowing that the job did not have the appropriate DTE crew, DTE still sent contract laborers to assist with the digging of a hole to access the faulted stretch of the cable.

16. Petrovich informed the contract laborers where to start digging; however, after digging to a depth of approximately five feet, Petrovich stopped the job and advised DTE dispatch that he needs Miss Dig representatives and an excavator at the site.

17. In the early hours of the morning of October 17, 2021, Petrovich reached the end of his scheduled shift; Petrovich instructed the contract laborers to wait for another DTE crew before resuming the digging.

18. Despite this instruction, the contract laborers proceeded to dig without DTE personnel on site; this action turned the job from a DTE two-man job into a one-man job pursuant to the policies and procedures of DTE.

19. DTE assigned Joel Wizinsky ("Wizinsky") to replace Petrovich on the Livingston County site; later that morning, DTE assigned Plaintiff Devezin to also report to the Livingston County site, as the second man.

20. Wizinsky and Plaintiff hold the same rank within DTE: Cable Splicer Specialist Leader.

21. Because of the callout ranking, the fact that Wizinsky was assigned first and arrived at the site first, Wizinsky was the job leader.

22. Upon arrival at the Livingston County site, Plaintiff Devezin complied with all applicable DTE policies and procedures.

23. Plaintiff then exited his truck and went to the hole that the DTE contractors had dug around the faulty electrical cable.

24. Wizinsky then exited the hole and gave a pre-job briefing to Plaintiff.

25. Wizinsky told Plaintiff he had identified the location of the fault, but that the contractors needed to do some additional digging to allow for DTE to repair the fault.

26. Wizinsky also informed Plaintiff that Petrovich had been on site the previous night and that Petrovich had isolated the cable between the number 4 and number 5 transformers and that he (Wizinsky) had tested, drained and hung red tags. Red tags provide notice to all persons on site that the crew is working on that particular cable and that cable should not be touched or disturbed.

27. Wizinsky informed Plaintiff that he would sign Plaintiff onto his pre-job briefing and protection log, which was allowed under the COVID protocols then in place at DTE.

28. Wizinsky told Plaintiff that Petrovich had isolated the fault somewhere between transformers four and five.

29. Wizinsky told Plaintiff that three other jobs had been assigned to him by DTE supervisors, that Plaintiff did not need to remain at the work site and that Plaintiff should go to one of the other work sites where there had been a power disruption.

30. Wizinsky further told Plaintiff that the jobsite involved a 13.2kv radial fed primary feeder and pursuant to DTE policy, only one person is needed to make the repairs; Wizinsky further stated that Devezin should pick up the equipment needed for the next job.

31. The other three jobs also required the use of a fault locating device (FLD), so Wizinsky told Plaintiff that he should return to their service center to pick up the FLD for the next jobsite.

32. Prior to Plaintiff leaving the site, Wizinsky came out of the excavated hole to show Plaintiff where they were on the jobsite digital print.

33. Plaintiff attempted to change the zoom of the digital print so that he could see the entire jobsite, but Wizinsky stopped Plaintiff and said that he was "1,000%

sure" of the location of the fault and that he needed to get back into the excavated hole because the customers had been without power all night.

34. Plaintiff asked Wizinsky if he wanted some wood planks to use as a platform so that he would not have to stand in the mud.

35. Plaintiff returned to his truck to retrieve the wood; however, while Plaintiff was at the truck one of the DTE contractors called to Plaintiff and told him that Wizinsky no longer wants the wood.

36. Plaintiff began walking back to the hole where Wizinsky was working to tell him that he was leaving the site.

37. As Plaintiff was walking towards the hole, he heard a loud electrical sound, the sound of an arc flash; Plaintiff rushed to the hole where he saw Wizinsky's body violently shaking.

38. Plaintiff yelled to Wizinsky not to move, because he saw that there was an electrical cable near his feet.

39. Plaintiff rushed to his truck to retrieve the tools necessary to shut down the transformer so that no electricity could be sent through the cable.

40. Just as Plaintiff arrived at the transformer to shut it down, he heard one of the DTE contractors yell "no Joel" to Wizinsky and then he heard a second loud electrical sound.

41. Tragically, Wizinsky was killed by the second electrical shock that he suffered that day.

42. Following the October 17, 2021 incident, DTE placed Plaintiff on a paid administrative leave while it conducted an investigation.

43. On or about December 21, 2022, DTE discharged Plaintiff from his employment for alleged violations of DTE's policies and procedures.

## COUNT I
## VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT
## RACE DISCRIMINATION

44. Plaintiff hereby incorporates all previous paragraphs of this Complaint as if fully set forth herein.

45. Title VII of the Civil Rights Act, 42 U.S.C. § 2000e provides that it "shall be unlawful employment practice for an employer to… discharge any individual… because of such individual's… race…"

46. Plaintiff's race, African-American, was a significant motiving factor in Defendant's decision to terminate Plaintiff's employment.

47. If Plaintiff had been white, he would not have been terminated from his employment with Defendant.

48. If Plaintiff had been of non-African-American race, he would not have been terminated with his employment with Defendant.

7

49. At all pertinent times, Defendant was an employer covered by, and within the meaning of, Title VII.

50. Plaintiff is a member of a protected class based on his African-American race.

51. Plaintiff was qualified for the position of Cable Splicer Specialist Leader for Defendant DTE.

52. Plaintiff suffered adverse employment action, including but not limited to, reprimand and discharge.

53. Similarly situated white employees were treated more favorably than Plaintiff, despite the same or similar conduct.

54. White employees who were alleged to have violated the same or similar DTE policies were not discharged from employment, including but not limited to:

   a. Eric Meeseman, who was a white DTE journeyman cable splicer, went to a worksite with Alan Newman, who was an apprentice at the time. They were assigned a job working on power lines in a manhole. They violated multiple DTE policies and procedures, the most severe of which was cutting into the energized cable that they were working on without a proper test. Further, Newman was the person to cut the cable, and as an apprentice, he was not allowed to cut, pursuant to DTE policy. Newman suffered severe burns when he was shocked by the electrical cable. Despite having clearly violated DTE policy, Neither Meeseman nor Newman were discharged from employment.
   b. Multiple white DTE crew members violated DTE policies when they failed to properly secure a large radiator/cooling fan while it was being replaced. As a result of the policy violations, the radiator/cooling fan fell onto Peter Paczowski, one of the DTE crewmen, killing him. None of the white DTE crew members were discharged as a result of this incident.

c. John Wagner, a white DTE supervisor, referred to one of his African-American subordinates as "my n----r", a clear violation of DTE policies, but was not discharged.
d. Brad Akey, Brandon Donaldson and Jeremy Dyer, all of whom are white DTE employees, cut into an electrical cable that was still under power. Further, they cut into the wrong cable. These are clear violations of DTE policies. None of the three individuals were discharged from their employment with DTE.
e. Jason Mackenzie, a white male journeyman DTE employee, was at a worksite with his Leader, Malea Burrell, an African-American DTE leader. Michael Butler, a white apprentice, was also at the site. Mackenzie violated several DTE policies, including failure to use proper personal protection equipment (PPE), which resulted in Butler suffering electrical shock injuries when he made contact with a secondary cable. Mackenzie was issued minor discipline, and was not discharged or demoted, while Burrell, the African-American leader, was demoted from her position.
f. Brian Gibbs, a white DTE journeyman, suffered serious injuries when he contacted an electrical cable following violations of DTE policies, including failure to use proper PPE. Gibbs was not discharged from his employment with DTE.
g. Fred Dyer and Eric O'Connell, both white DTE journeymen, were working on a site with two African-American apprentices, Khalani Carr and Akil Williamson. Dyer and O'Connell wanted to work together so they performed work on a different part of the site, while they instructed Carr and Williamson to work together on the electrical cable. This is a clear violation of DTE policies. As a result of the policy violations, Carr suffered severe burn injuries. Neither Dyer nor O'Connell were discharged from their employment with DTE.
h. Jeremy Gregoire and Tim Wallace, both white DTE leaders, were working together at a DTE worksite. Gregoire worked on the secondary cable without the proper PPE. Gregoire suffered injuries when he was shocked by the cable. Both Gregoire and Wallace left the scene without reporting the incident. Both the lack of PPE and the failure to report the incident were violations of DTE policies. Neither Gregoire nor Wallace were discharged from their employment with DTE.
i. Keith Thomas and Wayne Morris are both African-American Cable Splicer Specialist Leaders with DTE. They were working at

a jobsite with Dane Roberts, a white apprentice. Roberts suffered electrical burns when he was working on a secondary cable. Thomas and Morris were issued severe discipline for a failure to immediately report the incident. When white DTE leaders Gregoire and Wallace engaged in the same or similar (or even worse) conduct, they were not disciplined. When white DTE journeymen Dyer and O'Connell engaged in the same or similar (or even worse) conduct, they were not disciplined.

55. As a direct and proximate result of DTE's violations of Title VII of the Civil Rights Act, Plaintiff has suffered damages, including but not limited to: lost past and future wages, lost past and future employment benefits, loss of earning capacity and emotional distress.

## COUNT II
## VIOLATION OF 42 USC §1981

56. Plaintiff hereby incorporates all previous paragraphs of this Complaint as if fully set forth herein.

57. By the conduct described above, Defendant DTE intentionally deprived Plaintiff of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with Defendant in violation of 42 USC §1981.

58. As a direct and proximate result of Defendant's violation of 42 USC §1981, Plaintiff has suffered damages as fully set forth in paragraph 46 of this Complaint.

59. In addition, Defendant's conduct was done with reckless disregard for Plaintiff's federally protected civil rights, entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff Christopher Devezin prays that this Honorable Court enter a judgment in his favor against Defendant DTE Energy Company in an amount that this Court deems fair and just, plus costs, interest and attorney fees.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury of the within cause.

>STEMPIEN LAW, PLLC
>
>*/s/ Eric Stempien*
>By: Eric Stempien (P58703)
>Attorney for Plaintiff

Dated: December 22, 2023